**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| PROGRESS RAIL SERVICES CORP., and PROGRESS RAIL LOCOMOTIVE INC., | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) |
| WESTINGHOUSE AIR BRAKE TECHNOLOGIES CORP., and WABTEC RAILWAY ELECTRONICS, INC, | ) ) ) ) |
| Defendants. | ) ) |

C.A. No. 23-

**JURY TRIAL DEMANDED**

**CONFIDENTIAL
FILED UNDER SEAL**

<u>**COMPLAINT**</u>

Plaintiffs, Progress Rail Services Corporation and Progress Rail Locomotive Inc. (collectively, "Progress Rail" or "Plaintiffs"), bring this action for divestiture, injunctive relief, and damages against Westinghouse Air Brake Technologies Corporation and Wabtec Railway Electronics, Inc. (collectively, "Wabtec" or "Defendants").  Progress Rail alleges as follows:

## I.      <u>NATURE OF THE ACTION</u>

1.      The freight rail industry is integral to the U.S. supply chain and the functioning of the U.S. economy more broadly.  Freight locomotives provide the muscle necessary to transport the essential goods and resources millions of Americans rely on every day.  Robust competition to develop, manufacture, and sell freight locomotives and complimentary cab components is therefore essential to ensure the freight rail transportation industry and the consumers who rely on its services receive the best products at competitive prices.

2.      In 2019, however, the competitive balance critical to the freight locomotive industry was disrupted when Wabtec acquired General Electric Co. ("GE") Transportation.  That combination merged the sole supplier of certain key freight locomotive inputs (Wabtec) with the

dominant supplier of finished freight locomotives and other cab technologies (GE Transportation). It created a vertically integrated entity with dominant positions in multiple products and the incentive and ability to engage in anticompetitive exclusionary conduct to harm the competitive process and consumers.

3.     Wabtec, a conceded monopolist, is one of the only or leading manufacturers of a long list of equipment used in the U.S. freight rail network.  It is the dominant supplier of freight locomotives, having manufactured and sold approximately 75 percent of active diesel long-haul freight locomotives in North America[1], and approximately 90 percent of new long-haul freight locomotives that comply with Tier IV rail industry standards and the Environmental Protection Agency's ("EPA") most recent emissions regulations ("Tier IV long-haul freight locomotives").[2]

4.     Wabtec also commands substantial market power over many inputs that are incorporated into freight locomotives: (a) it is the dominant supplier of Energy Management Systems ("EMS"), with its Trip Optimizer product holding approximately 79 percent of the market; (b) it is the dominant supplier of Positive Train Control ("PTC") systems, with its Interoperable Electronic Train Management System ("I-ETMS") product installed on virtually all freight locomotives, and (c) it is the dominant supplier of distributed power systems, with its LOCOTROL product holding nearly 100 percent of the market.

---

[1]     Bill Stephens, *Wabtec's moonshot: Zero-emissions locomotives*, Trains (Nov. 29, 2021), https://www.trains.com/trn/news-reviews/news-wire/wabtecs-moonshot-zero-emissions-locomotives/.

[2]     John Olin, Wabtec Executive Vice President and Chief Financial Officer, Goldman Sachs Industrials Conference (May 9, 2023), https://ir.wabteccorp.com/events/event-details/goldman-sachs-industrials-conference.

5.     Wabtec's acquisition of GE Transportation created a vertically integrated entity with dominant positions in multiple products and the incentive and ability to engage in anticompetitive exclusionary conduct to harm the competitive process and consumers.

6.     At the time, those competitive issues prompted a review of the merger by the Department of Justice ("DOJ").  Progress Rail also was concerned about these issues given its reliance on Wabtec for key components for its freight locomotives and the fact that it competed with GE Transportation on finished freight locomotives.

7.     Due to the competition issues raised by Progress Rail and likely to bolster its position with DOJ, Westinghouse Air Brake Technologies Corporation entered into a February 7, 2019, Joint Development, Compatibility, Interchangeability and License Agreement ("2019 Interchangeability Agreement") with Progress Rail.

8.     The 2019 Interchangeability Agreement specifies that it was deemed to be effective as of the closing of Wabtec's acquisition of GE Transportation and continues in full force and effect for a period of 15 years.  In the 2019 Interchangeability Agreement, Wabtec professed its "desire to continue the current open marketplace for locomotive cab electronics and other products in furtherance of open competition, compatibility and interchangeability of locomotives and locomotive components."  A copy of the 2019 Interchangeability Agreement is attached to the Complaint as Exhibit A.

9.     On June 5, 2020, Wabtec Railway Electronics, Inc. also entered into the WRE Interoperable Electronic Train Management System (I-ETMS) License Agreement with Progress Rail ("2020 I-ETMS License Agreement").  The 2020 I-ETMS License Agreement specifically references the 2019 Interchangeability Agreement and states that it shall be coterminous with the 2019 Interchangeability Agreement, which continues until February 25, 2034.

3

10.     In the 2020 I-ETMS License Agreement, Wabtec professed its desire to "facilitate the integration" of its PTC system to allow Progress Rail's EMS system to remain compatible and integrated with the PTC system.  A copy of the 2020 I-ETMS License Agreement is attached to the Complaint as Exhibit B.

11.     A PTC system is designed to automatically stop a train to prevent certain types of accidents, such as train-to-train collisions.  It also provides the critical interface through which many other locomotive electronic systems must interoperate.  Wabtec describes its PTC system as a "safety-critical overlay system" that "integrates new technology with existing train control and operating systems to enhance train-operation safety."

12.     Wabtec's professed commitment to "open competition," "integration," and compatibility, however, was hollow and instead it has used its dominant market position to engage in anticompetitive exclusionary conduct that has harmed and continues to harm competition and consumers.

13.     Consistent with concerns raised at the time of transaction, Wabtec's acquisition of GE Transportation resulted in a vertically integrated entity with the incentive and ability to engage in anticompetitive exclusionary conduct to harm competition in multiple markets.  As alleged below, engaging in anticompetitive exclusionary conduct and harming the competitive process is exactly what Wabtec has done and necessitates the requested relief to unwind that transaction.

14.     In particular, this action is directed at Wabtec's anticompetitive conduct in the markets for diesel long-haul freight locomotives, Tier IV long-haul freight locomotives, and EMS systems.

15.     Wabtec uses its market power to engage in a pattern of anticompetitive conduct, the design and effect of which is to build upon and cement its monopoly by deterring customers

from freely switching providers, stifling the ability of existing competitors from effectively competing and reaching scale, and stopping new competitors from entering the market.

16.     The exclusionary tactics Wabtec uses both individually and in combination to harm the competitive process and consumers include, but are not limited to:

- Using its dominant position to reduce rail industry required cross-product compatibility with complementary products through, among other things, restricting the flow of critical data and information.

- Using its dominant position to impose unnecessary costs and delays on competitors with the goal of impairing and forcing competitors out of business and obtaining even greater power to control prices.

- Using its dominant position to make knowingly false statements to consumers about the viability of its competitor.

17.     Wabtec's anticompetitive tactics have been, and continue to be, effective in extending and maintaining its monopoly power in the markets for diesel long-haul freight locomotives, Tier IV long-haul freight locomotives, and EMS systems by, among other things, fortifying existing and creating artificial barriers to entry.

18.     Progress Rail competes against Wabtec in the development, manufacture, and sale of diesel long-haul freight locomotives, Tier IV long-haul freight locomotives, EMS systems, and other equipment used in the U.S. freight rail network.  For example, Progress Rail has produced most of the non-Wabtec diesel freight locomotives in the United States during the last ten years, and after Wabtec, Progress Rail is the second largest producer of Tier IV locomotives in the United States.  Progress Rail also develops and sells related solutions and technologies that enhance the safety and efficiency of locomotives, like its next generation EMS system called Talos and its event recorder called PowerView Event Recorder.

19.     Progress Rail is a direct target of Wabtec's anticompetitive conduct.  For example, Wabtec abuses its complete control over federally mandated PTC systems to cause Progress Rail

unnecessary integration issues that are costly and time consuming to rectify.  These integration issues are designed to place Progress Rail at a competitive disadvantage with current and potential customers.

20.     On top of interfering with the interoperability of products and freight locomotives, Wabtec has falsely and publicly stated that (a) Progress Rail is "exiting" the Tier IV locomotive business, (b) Progress Rail "won't be competing going forward," and (c) Progress Rail "would not be an option for a customer" for "anything that's new in the United States from here on out. . . ."[3] Such knowingly false public statements directly harm competition and improperly strengthen Wabtec's existing monopoly over Tier IV locomotives because they intentionally mislead countless existing and potential customers to believe that Progress Rail has left or will soon leave the market, and Wabtec is their only choice.

21.     Because of Wabtec's anticompetitive conduct, Progress Rail has lost existing and potential customers for its products.  Absent Wabtec's anticompetitive conduct, Progress Rail's revenues would be substantially greater, and its competitive influence would have a downward effect on pricing, provide more consumer choice, and enhance innovation and safety in the relevant markets.

22.     Wabtec's anticompetitive conduct also injures consumers.  Freight railroads are injured because they are: (a) deprived of the freedom to make competitive choices about which products should be used on their equipment; (b) deprived of the benefit of continuous innovation; and (c) deprived of competitive pricing.

---

[3]     John Olin, Wabtec Executive Vice President and Chief Financial Officer, Goldman Sachs Industrials Conference (May 9, 2023), https://ir.wabteccorp.com/events/event-details/goldman-sachs-industrials-conference.

23.    Freight railroad users are similarly injured because they also pay higher prices and are deprived of innovation.

24.    Wabtec has profited, and continues to profit, from its unlawful, exclusionary conduct, to the detriment of consumers.  Wabtec's Chief Financial Officer stated during a July 27, 2023 call with analysts about second quarter earnings: "We've watched our margins come up over the last couple of years, and that is a function of bringing in better orders at higher profit."[4]

25.    Wabtec has resorted to these anticompetitive tactics because the potential entry of new competitors and the ability of existing competitors to compete and/or reach scale will threaten Wabtec's dominance over diesel long-haul freight locomotives, Tier IV long-haul freight locomotives, and EMS systems.

26.    Unless stopped, Wabtec will continue to misuse its monopoly power to artificially exclude competition, stifle innovation, fortify existing and create new barriers to entry, and deprive consumers of free choice and price competition.  Such unchecked conduct will make the freight locomotives that drive this Country's economy more expensive, less safe, and worse for the environment.

27.    Indeed, the presence of competitive influences, such as Progress Rail, are necessary to ensure that the rail industry receives innovative, efficient, and safe products at reasonable prices.

28.    As a result, Progress Rail brings this action for divestiture, injunctive relief, and damages against Wabtec for violations of Section 7 of the Clayton Act, 15 U.S.C. §§ 18, 26, Section 2 of the Sherman Act, 15 U.S.C. § 2, Section 43 of the Lanham Act, 15 U.S.C. § 1125(a), the Delaware Deceptive Trade Practices Act, 6 Del. C. §§ 2532, 2533, and state common law.

---

[4]    John Olin, Wabtec Executive Vice President and Chief Financial Officer, Westinghouse Air Brake Technologies Corp. Q2 2023 Earnings Call (July 27, 2023), https://ir.wabteccorp.com/static-files/c3e878fe-e5fa-470d-8cf4-492dd3b317f4.

## II.   PARTIES

29.    Plaintiff Progress Rail Locomotive Inc. engineers and manufactures locomotives, services locomotives, manufactures and sells locomotive components, and designs and sells advanced technology systems for locomotives.  Progress Rail Locomotive Inc. is incorporated in Delaware with a registered principal place of business in LaGrange, Illinois.

30.    Plaintiff Progress Rail Services Corporation manufactures and sells rail track, rail anchors, and other track components, as well as offers maintenance of way equipment, rail signaling, and safety devices.  It also reconditions and repairs freight cars and related components. Progress Rail Services Corporation is headquartered in Albertville, Alabama and incorporated in Alabama.

31.    Defendant Westinghouse Air Brake Technologies Corporation is the largest global manufacturer of diesel-electric locomotives for freight railroads.  It is a leading global provider of equipment, systems, technology, and services for the freight rail, transit, mining, industrial, and marine industries.  Its freight business segment manufactures new locomotives; overhauls existing locomotives; provides aftermarket parts and services to existing locomotives; and provides components to new and existing freight cars.  Westinghouse Air Brake Technologies Corporation is a Delaware corporation with headquarters at 30 Isabella Street, Pittsburgh, Pennsylvania.

32.    Defendant Wabtec Railway Electronics, Inc. designs and manufactures train control systems and supplies rail control and infrastructure products, including electronics and PTC systems.  It is a wholly owned subsidiary of Defendant Westinghouse Air Brake Technologies Corporation.  Wabtec Railway Electronics, Inc. is a Delaware corporation with headquarters at 30 Isabella Street, Pittsburgh, Pennsylvania.

### III.   JURISDICTION AND VENUE

33.    Progress Rail brings this lawsuit pursuant to Sections 4, 7 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 18 and 26, Section 2 of the Sherman Act, 15 U.S.C. § 2, and Section 43 of the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, to enjoin Wabtec's anticompetitive conduct through, among other things, divestiture, to recover damages and the costs of suit including reasonable attorneys' fees, and for such other relief as is afforded under the antitrust laws of the United States, the Lanham Act, and state common law.

34.    This Court has subject matter jurisdiction over Progress Rail's claims under 28 U.S.C. §§ 1331 and 1337 as Counts I, II, and III arise under federal statutes—namely the Clayton Act, 15 U.S.C. § 26, the Sherman Antitrust Act, 15 U.S.C. § 2, and the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*

35.    This Court has supplemental jurisdiction over the state law causes of action under 28 U.S.C. § 1367 because the state law causes of action are so related to the causes of action within the Court's federal question jurisdiction that the state law causes of action form part of the same case or controversy.

36.    This court has personal jurisdiction over Westinghouse Air Brake Technologies Corporation and Wabtec Railway Electronics, Inc. because Westinghouse Air Brake Technologies Corporation and Wabtec Railway Electronics, Inc. are incorporated under Delaware law and do business in Delaware.  *See* 15 U.S.C. § 22.

37.    Venue is proper in this judicial district under 15 U.S.C. §§ 1391 and 1400 because Westinghouse Air Brake Technologies Corporation and Wabtec Railway Electronics, Inc. are deemed to reside here by virtue of being incorporated in the State of Delaware.  Venue is also proper under 15 U.S.C. § 22.

## IV.   TRADE AND COMMERCE

38.     Wabtec has sold and continues to sell the products at issue in or otherwise relevant to this case—namely, diesel long-haul freight locomotives, Tier IV long-haul freight locomotives, PTC systems, EMS systems, distributed power systems, and event recorders—in the United States in a continuous and uninterrupted flow of interstate commerce, including through and into this judicial district.

39.     Wabtec's business activities were intended to and have a substantial effect on interstate trade and commerce in the United States, including in this judicial district.  The acts complained of have and will continue to have substantial effects in this judicial district.

## V.   INDUSTRY BACKGROUND

### A.  The U.S. Railroad Freight Industry

40.     The freight rail industry is critical to the functioning of the U.S. economy.  The Association of American Railroads ("AAR") estimates that U.S. freight railroads annually transport 1.6 billion tons across nearly 140,000 miles of track.[5]  Freight railroads ship food, grain, chemicals, crude oil, construction materials, motor vehicles, chemicals for pharmaceuticals, and many other products that Americans use every day.  And there are no good alternatives to freight rail transportation—transporting this freight without railroads would require 83 million additional trucks on American roads and require four times more fuel than is consumed by the railroads.

41.     U.S. freight railways are divided into "classes" according to revenue benchmarks established by the Surface Transportation Board ("STB").  Class I freight railroads are considered the largest, earn the most revenue, and provide long-haul freight service.  Class II and III freight

---

[5]     *Freight Rail Facts & Figures*, Association of American Railroads (June 2023), https://www.aar.org/facts-figures#4-capacity-amp-service

railroads earn less revenue and are generally referred to as "short lines" because they haul freight shorter distances.

42.     Class I freight railroads, as currently classified by the STB, are freight railroads with an operating revenue greater than $1.032 billion (adjusted for inflation).  Class I railroads account for roughly 67 percent of freight rail mileage and 94 percent of revenue.  The current freight railroads that qualify as Class I are: Union Pacific; BNSF Railway; Canadian National; Canadian Pacific Kansas City; CSX Transportation; and Norfolk Southern.[6]

43.     Class I freight railroads are the primary purchasers of diesel long-haul freight locomotives, Tier IV long-haul freight locomotives, and EMS systems.

### B.  U.S. Regulation – Railroad Freight Industry

44.     Class I freight railroads generally own their own track.  Freight cars often must travel over multiple tracks owned by different railroads to deliver goods throughout the United States.  Traveling over multiple tracks requires freight car equipment to be interoperable and meet certain performance and safety standards.

45.     The Federal Railroad Administration of the U.S. Department of Transportation establishes standards to ensure interoperability of freight cars on the U.S. freight rail network.  These standards require that certain components meet performance and interoperability requirements.

46.     AAR is a policy and standard setting organization that includes full, affiliate, and associate members.  Class I freight railroads are full members.  Rail equipment suppliers and freight car owners are either affiliate or associate members.

---

[6]     *Class I Railroads*, Trains Magazine (Feb. 21, 2023), https://www.trains.com/trn/train-basics/abcs-of-railroading/class-i-railroads/

47.     AAR sets technical, performance, and mechanical industry standards for freight rail equipment, pursuant to preferences from freight railroads and overall industry feedback.  Freight rail customers typically require manufacturers like Wabtec and Progress Rail to meet AAR standards for any locomotives sold for use in the United States.  Class I railroads view AAR compliance as a critical contract specification requirement.

### C. Freight Locomotives

48.     Locomotives are the heart of the freight rail industry.  A freight train is a group of freight cars hauled by one or more locomotives on a railway.  A typical diesel freight locomotive can haul as many as 25 to 100 freight cars.

49.     Freight locomotives are highly complex, highly technical vehicles that must operate in extreme conditions, negotiating temperature and altitude fluctuations under heavy loads.  A single freight train, which can be over a mile and a half in length, can haul thousands of tons of freight while climbing and descending a hill with half of its cars veering left and the other half veering right.  Freight locomotives use advanced technology like sensors and computer programs that monitor and assess dozens of variables to handle these complexities.  Derailments can occur without such technology managing the in-train forces caused by these dynamics.

50.     There are various types of freight locomotives that are more appropriate for certain tasks.  For example, long-haul freight locomotives (sometimes referred to as "mainline," or "high horsepower," or "heavy haul") require higher horsepower than locomotives that only move freight intermediate or short distances.

51.     The difference in horsepower requirements, alongside other differences, mean that long-haul freight locomotives are not interchangeable with locomotives that only move freight intermediate or short distances.  Indeed, the railroad industry and the EPA recognize the distinction

between high-powered locomotives used for moving freight long distances and locomotives used for moving freight only for intermediate distances or within a trainyard.

52.     Long-haul freight locomotives are generally diesel powered.  The EPA regulates diesel locomotives to ensure they comply with specific standards for oxides of nitrogen, hydrocarbons, carbon monoxide, particulate matter, and smoke.  In 1998, the EPA issued its Final Rule setting Tier 0, Tier I, and Tier II standards, which took effect in 2000.  These standards applied to certain nonroad diesel engines, including those used in locomotives manufactured (or "remanufactured," a term of art) after 1972.

53.     In 2008, the EPA adopted stricter Tier III and Tier IV standards for diesel locomotive engines.  Tier III standards took effect in 2011 and 2012, while Tier IV standards took effect in 2015.

54.     Tier IV standards seek to reduce particulate matter and nitrogen oxide emissions by 90 and 80 percent respectively compared to those meeting Tier II standards.  By 2030, Tier IV standards seek a reduction in annual emissions of nitrogen oxides and particulate matter by 800,000 tons and 27,000 tons, respectively.

55.     With some limited exceptions, locomotives that were manufactured or remanufactured in or after 2015 must comply with Tier IV standards to operate in the United States.  Freight railroads, however, may still operate locomotives that complied with the earlier standards at the time they were manufactured or remanufactured.

56.     The Tier IV emissions standards published in 2015 (40 C.F.R. Part 1033) allow for the generation of emissions credits for every Tier IV locomotive produced with emissions below required standards.  This emissions delta results in credits that may be "bank[ed]" by locomotive manufacturers, 40 C.F.R. § 1033.715, and then used to offset higher emissions by other

locomotives, 40 C.F.R. § 1033.701(a).  One Tier IV credit-consuming locomotive- (*i.e.*, Tier III locomotive) may be sold for every newly manufactured Tier IV locomotive.

57.     Compliance with Tier IV standards has taken on increased importance for freight railroads because individual states (and potentially the EPA) are considering regulations to require that all locomotives comply with the Tier IV standards, regardless of when the locomotive was manufactured or remanufactured.

58.     For example, the California Air Resources Board has proposed the In-Use Locomotive Regulation.  Under this Regulation, a railroad's annual fleet locomotive usage in California must be 50 percent Tier IV or cleaner locomotives starting January 1, 2030, and all of a railroad's fleet locomotive usage must be Tier IV or cleaner locomotives starting January 1, 2035.[7]  Railroads can avoid these requirements if (among other things) they: (1) deposit funds into certain accounts based on the emissions they create and the funds can be used to purchase Tier IV locomotives; and (2) starting in 2030, they do not operate locomotives trains that are older than 23 years old.  The California Air Resources Board intends to submit the Regulation to the Office of Administrative Law after receiving comments from the public.

59.     Other states interested in reducing greenhouse gas emissions are expected to follow California's lead.[8]  This regulatory focus on Tier IV compliance has and will continue to create increased and unique demand for Tier IV long-haul freight locomotives.

---

[7]     Locomotives Fact Sheet, California Air Resources Board, https://ww2.arb.ca.gov/our-work/programs/reducing-rail-emissions-california/locomotive-fact-sheets.

[8]     Sharon Udasin, *California adopts first-in-the-nation rule restricting locomotive emissions*, The Hill (April 27, 2023), https://thehill.com/policy/equilibrium-sustainability/3976267-california-adopts-first-in-the-nation-rule-restricting-locomotive-emissions/ ("If California receives the EPA's authorization on the locomotive regulation, other states would be able to follow suit.  Similarly, when CARB voted to ban the sale of gas-powered cars by 2035 in August, other states quickly expressed their intentions to follow.").

### D.  PTC Systems

60.     A PTC system is designed to automatically stop a train to prevent certain types of accidents, such as train-to-train collisions.  Wabtec describes its PTC system as a "safety-critical overlay system" that "integrates new technology with existing train control and operating systems to enhance train-operation safety."

61.     Virtually every freight locomotive operating in North America carries Wabtec's PTC system.  This means that Wabtec has a lock on the critical interface through which many other locomotive electronic systems must interoperate.

62.     In 2008, Congress passed the Rail Safety Improvement Act ("RSIA").  RSIA mandates that Class I railroads, passenger rail operators, and certain other railroads implement PTC systems.  Railroads were originally required to complete PTC system implementation by December 31, 2015.  Congress initially extended the deadline for full PTC system implementation to December 31, 2018, and then provided a second extension to December 31, 2020.

63.     Under RSIA, a PTC system must be designed to automatically stop a train to prevent certain types of accidents, such as train-to-train collisions, over-speed derailments, incursions into work zone limits, and the movement of a train through a switch left in the wrong position.  RSIA also requires that PTC systems be interoperable so that any railroad's locomotive can operate on any other railroad's track while still using the same signaling and control systems.

64.     A PTC system has three main segments that are integrated by a wireless communications system: (a) Back Office, (b) Locomotive, and (c) Wayside.  The Back Office segment is a stationary, centrally located set of hardware and software that runs the server.  It stores a variety of rail network data, such as speed limits, track layouts, and train compositions. The Locomotive segment is installed on every locomotive and includes an onboard computer that

monitors a train's position and speed, as well as activates the brakes when necessary to comply with speed restrictions and avoid a hazard. The Wayside segment includes equipment placed alongside the railroad track, such as signals, switches, and crossings.

65.     The onboard computer is a critical component of a PTC system's Locomotive segment. The onboard computer uses data from the Back Office segment, the Wayside segment, GPS, and other sources to calculate warning and braking curves. It is responsible for notifying the train operator of a potentially dangerous situation. If the operator does not control the train in response to the dangerous situation, then the onboard computer will override the operator and apply the brakes as appropriate.

66.     Wabtec's onboard computer is called the Train Management Computer ("TMC"). The TMC consists of Train Control Processors, Business Application Processors, Input/Output, and an Ethernet Switch. It meets AAR locomotive environmental, vibration, and other specifications.

67.     After Congress enacted RSIA, the four largest Class I railroads formed the Interoperable Train Control Committee ("ITCC") to develop and coordinate, among other things, PTC interoperability efforts. At the time, Wabtec's system was the most advanced of the various PTC systems then under trial. The ITCC adopted Wabtec's system as the underlying architecture for interoperable PTC in North America.

68.     The AAR subsequently promulgated standards that generally reflect the architecture of Wabtec's system. Wabtec used its dominant market position to direct and limit the scope of the AAR's promulgated standards, which allowed Wabtec to cement its control over PTC systems and insulate itself from competition inside and outside the locomotive.

16

69.     The actions by the ITCC and AAR positioned Wabtec to be the dominant provider of PTC systems in the United States.  As Wabtec explained in a 2017 patent infringement lawsuit against a prospective competitor, "[a]s a result of its acceptance by the ITCC, Wabtec's I-ETMS solution became the main technical architecture for PTC in North America."[9]

70.     Today virtually every freight locomotive operating in North America carries a Wabtec PTC system.  Indeed, during its 2020 Investor Meeting, Wabtec's Global Technology Officer proclaimed that Wabtec's PTC system became "the standard and the backbone of the North American Freight operation" and that "[m]ore than 90% of the North American locomotive and cab car are equipped with Wabtec PTC."[10]  Wabtec has previously noted that it earns around $400 million in annual revenue from its PTC business line.

71.     Because virtually every freight locomotive operating in North America carries a Wabtec PTC system, Wabtec's TMC has become the critical communications hub through which many other locomotive electronic systems must interoperate.  A successful interface with TMC is a determinative factor in the success or failure of several locomotive hardware and software systems.

72.     As a manufacturer of diesel long-haul freight locomotives, Tier IV long-haul freight locomotives, and related solutions and technologies, Progress Rail and the railroads are forced to rely on Wabtec given its dominant position in PTC systems.

---

[9]     First Am. Compl. ¶ 33, *Westinghouse Air Brake Tech. Corp. v. Siemens Indus., Inc.*, No. 17-1687 (D. Del. Sept. 19, 2017), ECF No. 14.

[10]    Dominque Malenfant, Wabtec Global Technology Officer, Westinghouse Air Brake Technologies Corp. Investor Meeting (Mar. 10, 2020), https://ir.wabteccorp.com/static-files/4d318e0d-6824-425c-a63d-9f3f59eb7e82.

### E. Energy Management Systems

73.     Wabtec is the dominant supplier of EMS systems, with its Trip Optimizer product holding approximately 79 percent of the market in the United States.

74.     Progress Rail offers a competing EMS system called Talos.  Other producers also offer similar products, including New York Air Brake's LEADER product.

75.     An EMS system allows a locomotive to achieve on-time arrival with optimal fuel usage.

76.     An EMS system uses on-board software and GPS-based navigation to compute fuel efficient trips by collecting the locomotive's data and information about the route, weather, and other inputs.  It then provides cruise-control like functionality to train operators and engineers.

77.     Given its dependence on data, a well-functioning EMS system depends on seamless interfaces with other locomotive systems and software.  An EMS system is integrated with a PTC system.

78.     The combination of EMS systems and PTC systems serve as the foundation for future train technology, including autonomous train operations.  Indeed, Wabtec has told its investors that it sees "PTC and Trip Optimizer as building blocks" and that it is pursuing a strategy to use those "building blocks to implement more and more advanced capabilities like automation. . . ."[11]

79.     A locomotive manufacturer can generate emissions credits by furnishing the EPA with data derived from an EMS system.  These emissions credits may be banked by locomotive manufacturers and then used to offset emissions by other locomotives.

---

[11]   Peter Thomas, Wabtec Chief Commercial Officer-Digital Solutions, Global Technology Officer, Westinghouse Air Brake Technologies Corp. Investor Meeting (Mar. 10, 2020), https://ir.wabteccorp.com/static-files/4d318e0d-6824-425c-a63d-9f3f59eb7e82.

### F.  Wabtec's Acquisition of GE Transportation

80.    In May 2018, Wabtec announced its intent to acquire GE Transportation.  The acquisition would merge the sole supplier (*i.e.*, Wabtec) of key freight locomotive inputs with the dominant supplier of finished freight locomotives and other cab technology (*i.e.*, GE Transportation).

81.    Before the acquisition, Wabtec was not a meaningful player in the locomotive industry.  Instead, GE Transportation and Progress Rail were the two primary manufacturers of long-haul freight locomotives for use in the United States, with GE Transportation being the dominant supplier by far.  GE Transportation's strength in the long-haul freight locomotive market grew with next generation products.  For example, GE Transportation also brought a Tier IV-compliant long-haul locomotive to market and was the dominant player in that line as well.

82.    Before the acquisition, GE Transportation also supplied the dominant EMS system for the industry, called Trip Optimizer, the dominant distributed power product, called LOCOTROL, and the dominant ancillary card cage, called GoLINC.  LOCOTROL enables coordinated braking and power distribution between lead and trailing locomotives.  GoLINC provides a modular chassis system that allows locomotives to communicate and transfer data with third-party systems and other solutions.

83.    At that time, Wabtec already controlled the market for PTC systems.  It also held dominant positions for various other locomotive inputs.  For example, before the acquisition, Wabtec was the sole supplier of radiators for GE Transportation and Progress Rail locomotives.

84.    In the words of Wabtec's economists (Compass Lexecon) who were retained to evaluate the acquisition: (a) "GE Transportation is one of two manufacturers of long-haul freight

locomotives in the United States"—the other being Progress Rail—and (2) "Wabtec is the largest supplier of components used to manufacture long-haul freight locomotives."[12]

85.    The acquisition raised significant vertical foreclosure issues because the combination of a dominant upstream supplier with a dominant downstream manufacturer can lead to the merging downstream firm foreclosing alternative input suppliers.  Such foreclosure would harm alternative input suppliers' ability to compete in the upstream market given the long-standing dominant positions of Wabtec and GE Transportation.

86.    The acquisition also raised vertical foreclosure issues because the combination of a dominant downstream manufacturer with a dominant upstream supplier can lead to the merging upstream firm foreclosing other manufacturers.  Such foreclosure would harm alternative manufacturers' ability to compete in the downstream market given GE Transportation's dominant position in the long-haul freight locomotive market.

87.    Indeed, Progress Rail identified that the combined entity would have the ability and a strong incentive to foreclose competition in multiple markets, including the upstream supply of PTC systems, the downstream supply of freight locomotives, and the supply of key complementary cab electronics.  For example, the merger would provide Wabtec the post-acquisition ability and incentive to foreclose GE Transportation's only competitor (Progress Rail) from necessary inputs and information for its long-haul freight locomotives.

88.    The competition issues associated with the acquisition prompted a review by DOJ.

89.    Due to the foreclosure issues raised by Progress Rail and likely to bolster its case with DOJ, Wabtec entered into a February 7, 2019, Joint Development, Compatibility,

---

[12]    *Compass Lexecon Assists in Merger of Long-Haul Freight Locomotive Manufacturers*, Compass Lexecon (Jan. 16, 2019), https://www.compasslexecon.com/cases/compass-lexecon-assists-in-merger-of-long-haul-freight-locomotive-manufacturers/.

Interchangeability and License Agreement ("2019 Interchangeability Agreement") with Progress Rail.  The 2019 Interchangeability Agreement runs through 2034.

90.     The 2019 Interchangeability Agreement was expressly "conditioned" on the transaction between Wabtec and GE Transportation closing, and—in its recitals—Wabtec professed its "desire to continue the current open marketplace for locomotive cab electronics and other products in furtherance of open competition, compatibility and interchangeability of locomotives and locomotive components."

91.     In the 2019 Interchangeability Agreement, Wabtec agreed to "use commercially reasonable efforts to collaborate in the creation and maintenance of . . . Joint Standards and Specifications in order to continue open competition in the locomotive cab electronics industry." (*See* Ex. A, Art. 2.1.)   Joint Standards and Specifications are defined to include "(a) the Specification Documentation, including Specification Changes; (b) the Compatibility Information; or (c) information required to maintain interchangeability, compatibility or interface with features and functions of PTC" as required by the 2019 Interchangeability Agreement.  (*See* Ex. A, Appendix 1.)

92.     Wabtec further agreed not to implement or modify Joint Standards and Specifications in a manner that would "impact the ability of any locomotive component or system" to interoperate with Wabtec's systems and components unless Progress Rail was given adequate time to test and approve the change.

93.     Under the 2019 Interchangeability Agreement, for any PTC systems or cab locomotive products that existed as of the Effective Date, each Party agreed "to maintain at least the existing level of compliance after the Effective Date with all communication protocol and/or product interface parameters . . . to ensure continued compatibility and interoperability of the

Locomotive Products with each other and with alternative cab locomotive products. . . ."  (*See* Ex. A, Art. 1.5(a).)

94.     Regarding compatibility of future locomotive products under the 2019 Interchangeability Agreement, each party agreed to "the extent that any next generation Locomotive Product, or derivative of an existing Locomotive Product, is created during the Term, such Products shall comply with the Interface Parameters in the Applicable Standards to at least the same extent that the prior generation Locomotive Product complied."  (*See* Ex. A, Art. 1.5(b).) To the extent any new cab locomotive products created during the term of the agreement are not subject to an Applicable Standard, each Party agreed to work toward creating Interface Parameters and/or an Applicable Standard to make such products interoperable.  (*Id*.)

95.     Under the 2019 Interchangeability Agreement, Wabtec also agreed that it (a) "will not require the bundling of a PTC system with any functionality that is not required by AAR" and (b) "will continue to offer [Progress Rail] those Stand-Alone Systems and Components set forth on Exhibit C to this Agreement on a stand-alone basis, . . . , and will not require bundling of any of the Stand-Alone Systems and Components with any of each other, or any other systems or components, as a condition to sell, operate, maintain or provide services regarding such Stand-Alone Systems and Components."  (*See* Ex. A, Art. 1.4(a).)  The "Stand-Alone Systems and Components" include Wabtec products, such as PTC systems, GoLINC, Trip Optimizer, and LOCOTROL.

96.     Under the 2019 Interchangeability Agreement, Wabtec acknowledged that as of the Effective Date, "Trip Optimizer and the ACC GoLINC are currently only offered as a combined system."  Thus, Wabtec agreed "to work together [with Progress Rail] . . . to allow Trip Optimizer to run on a [Progress Rail] platform. . . ."  (*See* Ex. A, Art. 1.4(b).)

97.     While DOJ was conducting its own investigation into the proposed acquisition, Progress Rail provided DOJ with regular updates about the negotiations surrounding the 2019 Interchangeability Agreement.

98.     On information and belief, during the several months before the acquisition closed, Wabtec assured DOJ that the transaction would not impair competition by, among other things, updating DOJ on the status of the negotiations surrounding the 2019 Interchangeability Agreement.

99.     In February 2019, Wabtec announced that it completed its acquisition of GE Transportation.  The consummated merger added GE Transportation's dominant position over diesel long-haul freight locomotives, Tier IV long-haul freight locomotives, EMS systems (*i.e.*, Trip Optimizer), distributed power (*i.e.*, LOCOTROL), and ancillary card cages (*i.e.*, GoLINC) to Wabtec's preexisting control over inputs like PTC systems.

100.    Despite Wabtec's promises in the 2019 Interchangeability Agreement, the antitrust concerns about Wabtec's acquisition of GE Transportation have come to fruition.  Through its 2019 acquisition of GE Transportation, Wabtec enhanced its market power as a vertically integrated entity with dominant positions in multiple products and increased its ability to foreclose rivals, and as alleged below used its market power to do so.

### G.  The 2020 I-ETMS License Agreement

101.    After the acquisition of GE Transportation, Wabtec Railway Electronics, Inc. and Progress Rail Services Corporation agreed to the 2020 I-ETMS License Agreement on June 5, 2020.

102.     The recitals of the 2020 I-ETMS License Agreement specifically reference the 2019 Interchangeability Agreement.  The 2020 I-ETMS License Agreement also provides that it is conterminous with the 2019 Interchangeability Agreement, which expires in 2034.

103.     Under the 2020 I-ETMS License Agreement, Wabtec Railway Electronics, Inc. granted a perpetual, non-exclusive license to Progress Rail Service Corporation's permitted use for any future upgrades or changes to the on-board PTC system impacting the EMS system to allow Progress Rail Service Corporation's product to remain compatible and integrated.

104.     Under the 2020 I-ETMS License Agreement, Wabtec Railway Electronics, Inc. must timely deliver to Progress Rail Service Corporation changes, updates, and modifications to the on-board PTC system.

105.     Despite its promises to do otherwise when it executed the 2019 Interchangeability Agreement and the 2020 I-ETMS License Agreement, Wabtec has stifled the open competition that formed the foundation of those agreements by using its monopolies to foreclose competition not only in long-haul freight locomotives and Tier IV long-haul freight locomotives, but also for EMS systems.

106.     Since its acquisition of GE Transportation, Wabtec has engaged in anticompetitive exclusionary conduct to maintain and build upon its dominant market positions in the markets for diesel long-haul freight locomotives, Tier IV long-haul freight locomotives, and EMS systems sold in the United States, to the detriment of the market, Progress Rail, and customers.

### VI.     RELEVANT ANTITRUST MARKETS AND SUB-MARKET

#### A.  Relevant Product Markets

107.     There are three relevant product markets in this case: (1) the long-haul freight locomotives market; (2) the Tier IV long-haul freight locomotives market; and (3) the EMS

market.   The railroad freight industry recognizes these as distinct product lines with unique characteristics.

108.    Although PTC systems and distributed power systems are not relevant markets in this case, Wabtec uses its monopoly power in both to obtain and entrench its monopolies in the three relevant product markets.

### 1.   The Long-Haul Freight Locomotives Market

109.    The first relevant product market is the long-haul freight locomotives market. Long-haul freight locomotives (sometimes referred to as "mainline," or "high horsepower," or "heavy haul") are high-powered locomotives used for moving freight long distances.   They require higher horsepower than locomotives that only move freight intermediate or short distances. Intermediate- and short-distance locomotives are not substitutes because they lack the requisite horsepower.

110.    Long-haul freight locomotives are not reasonably interchangeable with any other product and do not have cross-elastic demand with any other product.

111.    Purchasers of long-haul freight locomotives, which are primarily railroads, cannot reasonably purchase non-long-haul freight locomotives or other freight transportation as substitutes for long-haul freight locomotives.   For example, purchasers of long-haul freight locomotives cannot switch to battery powered, non-diesel locomotives because those locomotives are not yet capable of traveling the long distances that long-haul freight locomotives travel.   There are insufficient charging systems throughout the United States that can recharge the battery powered, non-diesel locomotives for these locomotives to be an alternative.

112.    As another example, purchasers of long-haul freight locomotives also cannot switch to other forms of freight transportation (*e.g.*, cargo ships or eighteen wheel tractor-trailers)

because those forms of freight transportation cannot carry the same volumes of freight (as in the case of tractor-trailers), cannot deliver freight to the same locations (as in the case of cargo ships), and generally are an economically inefficient form of transportation for railroads to use in light of railroads' existing capital investments in rail transportation.

113.    Because there are no reasonable substitutes for long-haul freight locomotives, the ability to increase the prices for long-haul freight locomotives above their competitive levels is not reasonably constrained by the price of other products.  Consequently, a monopolist of long-haul freight locomotives (*i.e.*, Wabtec) has and will continue to profitably control prices for long-haul freight locomotives and exclude competition over a sustained period of time.

### 2.    The Tier IV Long-Haul Freight Locomotives Market

114.    The second relevant product market is the Tier IV long-haul freight locomotives submarket.  Tier IV long-haul freight locomotives are a subset of the broader long-haul freight locomotive market, which also includes lower tier (*i.e.*, Tier 0, I, II, and III) locomotives.  Tier IV long-haul freight locomotives comply with separate rail industry standards and the EPA's regulations for locomotives that were manufactured or remanufactured in or after 2015.

115.    Tier IV long-haul freight locomotives are not reasonably interchangeable with any other product and do not have cross-elastic demand with any other product.

116.    Purchasers of Tier IV long-haul freight locomotives, which are primarily railroads, cannot reasonably purchase non-Tier IV long-haul freight locomotives or other freight transportation as substitutes for Tier IV long-haul freight locomotives.

117.    The parties' marketing materials show that Tier IV locomotives are not interchangeable with non-Tier IV locomotives due to regulatory restrictions.  Wabtec's website advertises its Evolution Series ET44AC locomotive as meeting "the U.S. Environmental

Protection Agency's (EPA) stringent Tier IV emission standards without use of any type of after-treatment, which allows the railroads to have significant savings through area infrastructure cost avoidance and reduced operational costs."[13]  Progress Rail's website also highlights that its EMD 1010 T4 engine "achieves world-class fuel efficiency while meeting U.S. EPA Tier IV emissions standard," "[m]eets EPA Tier IV standards without urea after-treatment," and "[m]eets Tier IV emissions standards with world-class fuel efficiency."[14]

118.    Regulatory focus on Tier IV compliance has and will continue to create increased and unique demand for Tier IV locomotives.  As discussed above, the California Air Resources Board intends to submit the In-Use Locomotive Regulation to the Office of Administrative Law after receiving comments from the public.  Other states interested in reducing greenhouse gas emissions are expected to follow California's lead.[15]  As these rules are promulgated in different states, there will be an enhanced focus on Tier IV requirements industry wide.  Railroads that are preparing for this regulatory cliff will continue to prioritize Tier IV locomotives over non-Tier IV locomotives.

119.    Because there are no reasonable substitutes for Tier IV long-haul freight locomotives, the ability to increase the prices for Tier IV long-haul freight locomotives above their

---

[13]    Westinghouse Air Brake Technologies Corp., ET44AC Locomotive, https://www.wabteccorp.com/locomotive/heavy-haul-locomotives/et44ac-locomotive (last visited April 13, 2023).
[14]    Progress Rail, Locomotive Engines, https://www.progressrail.com/en/Segments/Engines/Locomotive_Engines.html (last visited April 13, 2023).
[15]    Sharon Udasin, *California adopts first-in-the-nation rule restricting locomotive emissions*, The Hill (April 27, 2023), https://thehill.com/policy/equilibrium-sustainability/3976267-california-adopts-first-in-the-nation-rule-restricting-locomotive-emissions/ ("If California receives the EPA's authorization on the locomotive regulation, other states would be able to follow suit.  Similarly, when CARB voted to ban the sale of gas-powered cars by 2035 in August, other states quickly expressed their intentions to follow.").

competitive levels is not reasonably constrained by the price of other products.  Consequently, a monopolist of Tier IV long-haul freight locomotives (*i.e.*, Wabtec) has and will continue to profitably control prices for Tier IV long-haul freight locomotives and exclude competition over a sustained period of time.

### 3.  The EMS Market

120.    The third relevant product market is the EMS systems market.  EMS systems collect data from the locomotives, use software to plan fuel efficient trips based on the locomotive's data and information about the route, weather, and other inputs, and then provide cruise-control like functionality to train operators and engineers.

121.    EMS systems are not reasonably interchangeable with any other product and do not have cross-elastic demand with any other product.

122.    Purchasers of EMS systems, which are primarily railroads, cannot reasonably purchase other products as substitutes for EMS systems.  Class I railroads (the primary purchasers of EMS systems) do not have alternative software solutions to EMS systems because these systems provide fuel efficiency and safety benefits that are not cognizable by other means.  For example, Wabtec's Trip Optimizer is EPA-certified for 10 percent fuel savings.[16]   Initial testing demonstrates that Progress Rail's Talos has overall fuel savings of around 10-15 percent on average.  Class I railroads cannot achieve this fuel efficiency (and other safety benefits) from alternative technologies or solutions.

123.    Class I railroads could completely overhaul a locomotive to achieve similar results, but such a process is cost prohibitive, and does not reasonably constrain the price of EMS systems.

---

[16]    Westinghouse Air Brake Technologies Corp., Trip Optimizer Brochure, https://www.wabteccorp.com/TripOptimizer-brochure.pdf?inline (last visited September 5, 2023).

124.     Because there are no reasonable substitutes for EMS systems, the ability to increase the prices for these systems above their competitive levels is not reasonably constrained by the price of other products.  Consequently, a monopolist of EMS systems (*i.e.*, Wabtec) can profitably control prices for EMS systems and exclude competitors over a sustained period of time.

### B.  Relevant Geographic Market

125.     The relevant geographic market is the United States.

126.     The United States is a relevant geographic market for long-haul freight locomotives because purchasers of long-haul freight locomotives in the United States cannot substitute to purchases of long-haul freight locomotives offered internationally.  This is because all long-haul freight locomotives in the United States must comply with U.S. law, namely the EPA's regulations, and purchasers are not allowed to circumvent these regulations through imports.  *See* 40 C.F.R. § 1068.101(a)(1); *see also* 40 C.F.R. § 1033.15(b).

127.     The United States is a relevant geographic market for Tier IV long-haul locomotives because the Tier IV designation is generated and enforced by United States law, namely the EPA's regulations.  As noted above, purchasers are not allowed to circumvent these regulations through imports.  Sellers of Tier IV locomotives are subject to civil penalties if they sell, offer to sell, or introduce or deliver into commerce in the United States or import into the United States a locomotive noncompliant with Tier IV standards.  *See* 40 C.F.R. § 1068.101(a)(1); *see also* 40 C.F.R. § 1033.15(b).

128.     The United States is a relevant geographic market for EMS systems used on long-haul freight locomotives.  These systems are designed to comply with Federal Railroad Administration regulations and interface with long-haul freight locomotives which—as explained

above—also are sold in a United States geographic market.  Customers do not have reasonable alternatives to purchasing EMS systems in the United States.

129.    In the alternative, North America is also a relevant geographic market for long-haul freight locomotives, Tier IV long-haul locomotives, and EMS systems.  While regulatory requirements in the United States shape the markets for all three of these products, as discussed above, some locomotives and inputs that are compliant with these United States regulations are sold for use in Canada and/or Mexico.  Indeed, Progress Rail estimates that most long-haul freight locomotives that operate in Canada or Mexico also operate in the United States, and so necessarily these locomotives must comply with U.S. emissions and safety regulations.  For this reason, North America is a relevant geographic market for all three product markets in this case.

### C.  Barriers to Entry

130.    The barriers to entry in the freight rail industry are high and there are significant barriers to entry in all three relevant markets.  Indeed, Wabtec has touted the relevant markets' high entry barriers for years.  In its 2022 annual report, Wabtec highlighted "significant barriers to entry" as a key factor for its "leading market position in core products," which includes freight locomotives, sustainable technologies like EMS systems, and freight service and repair in the United States.[17]  Nearly identical statements appear in every Wabtec annual report since at least 2014.  Similarly, in its 2020 investor conference presentation, Wabtec featured "High barriers to entry" as a core component in its value creation model for shareholders.[18]

---

[17]    Westinghouse Air Brake Technologies Corp., Annual Report 2022 (Feb. 15, 2023), https://ir.wabteccorp.com/static-files/d44caffd-48b4-4378-9a99-c3c5ffabea99.
[18]    Westinghouse Air Brake Technologies Corp., Wabtec 2020 Investor Conference (Mar. 10, 2020), https://ir.wabteccorp.com/static-files/8b50076d-e52a-41a1-ad52-254a42c07ef9.

131.    The barriers to entry in the freight rail industry include both technological and regulatory barriers.  Effective entry into the relevant markets requires an expertise in design engineering and obtaining certifications and approvals, which entails significant capital costs and substantial time to develop.

132.    Along with technological and regulatory barriers to entry, new entrants into the long-haul freight locomotive market, as well as the Tier IV long-haul freight locomotive market, would find it difficult to operate profitably solely based on sale of new locomotives because of: (a) the significant capital expenditures required to manufacture new locomotives; (b) the long sales cycles; and (c) the large volumes of necessary know-how and trade secrets that are protected as intellectual property.

133.    Indeed, there have been no meaningful new entrants to long-haul freight locomotive original equipment manufacturer market since 1950s.  GE Transportation (now Wabtec) and Electro-Motive Diesel (now Progress Rail) have been the two key players for decades.

134.    Moreover, locomotive manufacturers earn a substantial percentage of their revenue from modernization and maintenance services of previously sold locomotives.  New entrants, however, would have little to no revenue streams from modernization and maintenance services because they lack an installed base to service without previous locomotive sales.  New entrants attempting to establish revenue by servicing another manufacturer's locomotives also face significant competitive disadvantages and significant regulatory disadvantages (*e.g.*, risk would be created for the entity certifying compliance with EPA requirements due to the overlapping responsibilities).

135. Substantial barriers to entry also prevent effective competition from third-party remanufacturers of locomotives. While a handful of these companies exist, they struggle to survive in the market and offer no meaningful competition to Wabtec.

136. There are at least three such barriers that prevent effective competition from remanufacturers. First, as the EPA has enhanced enforcement of emissions testing, railroads have come to prefer original equipment manufacturers for servicing and remanufacturing. Second, it takes years to develop technology and know-how to service and remanufacture locomotives, bestowing an inherent competitive advantage on original equipment manufacturers. Third, many remanufacturers lack the scale to manage and fund remanufacturing projects, which are capital intensive and can take years to complete.

137. The EMS market also has high barriers to entry.

138. An EMS system must interface seamlessly with other systems and software on a long-haul freight locomotive to be safe and effective. As a result, the locomotive manufacturer is uniquely positioned to offer these products given their familiarity with the locomotive's systems and software. This is especially true for Wabtec, who controls the keys to the communications hub necessary for a successful interface because its PTC system and onboard computer are installed on virtually every locomotive in the United States.

139. Additionally, an EMS system must satisfy significant regulatory scrutiny, which again strongly favors those long-haul freight locomotive manufacturers that are most familiar with the regulatory landscape.

140. Wabtec's anticompetitive conduct as described herein has enhanced existing barriers to entry and has created new artificial barriers to effective entry into and expansion within the relevant markets.

## VII.    WABTEC'S MARKET POWER

141.    Wabtec's monopoly power is undeniable.  Its monopoly power is demonstrated by the combination of its persistent high market share and the high barriers to entry in each relevant market.

142.    Wabtec has monopoly power in the market for long-haul freight locomotives in the United States and North America.  At the time of Wabtec's acquisition of GE Transportation, Wabtec's own economists stated that "GE Transportation is one of two manufacturers of long-haul freight locomotives in the United States"—the other being Progress Rail.[19]  And trusted industry publications estimate that "75% of active locomotives in the North American fleet [were] produced by Wabtec."[20]

143.    Progress Rail's internal data estimates that Wabtec has sold 71 percent of all long-haul freight locomotives over the past 10 years (*i.e.*, from 2013 through the present).  Wabtec's share of current U.S. sales is higher than this historical data, as Wabtec has increasingly been able to foreclose Progress Rail from competing.  Wabtec's market shares in the United States and North America are generally the same.

144.    Wabtec itself has publicly suggested that its market share is even higher.  Wabtec's CFO has stated that Wabtec has "about an 80% share of what is running on the rails of heavy haul locomotives in North America. . . ."[21]

---

[19]    *Compass Lexecon Assists in Merger of Long-Haul Freight Locomotive Manufacturers*, Compass Lexecon (Jan. 16, 2019), https://www.compasslexecon.com/cases/compass-lexecon-assists-in-merger-of-long-haul-freight-locomotive-manufacturers/.

[20]    Bill Stephens, *Wabtec's moonshot: Zero-emissions locomotives*, Trains (Nov. 29, 2021), https://www.trains.com/trn/news-reviews/news-wire/wabtecs-moonshot-zero-emissions-locomotives/ (emphasis added).

[21]    John Olin, Wabtec Executive Vice President and Chief Financial Officer, Goldman Sachs Industrials Conference (May 9, 2023), https://ir.wabteccorp.com/events/event-details/goldman-sachs-industrials-conference (emphasis added).

145.    Wabtec has monopoly power in the market for Tier IV long-haul freight locomotives in the United States.  Wabtec's CFO has stated that Wabtec has sold 90 percent of the Tier IV long-haul freight locomotives in North America.  Based on its internal data, Progress Rail estimates that Wabtec's market share in the United States specifically (in contrast to North America as a whole) is also approximately 90 percent.

146.    The majority of Tier IV long-haul freight locomotives are sold in the United States. A small number of Tier IV long-haul freight locomotives are sold into Canada and Mexico— customers buy these locomotives so that they can be operated legally in the United States. However, the small numbers of these sales do not lead to materially different market shares for the United States than North America generally.

147.    Wabtec's Trip Optimizer is estimated to have 79 percent of the EMS market in both the United States and North America more generally.

148.    There are also high barriers to entry in each relevant market.  As described above, the barriers to entry in the freight rail industry include both technological and regulatory barriers. Effective entry into the relevant markets requires an expertise in design engineering and obtaining certifications and approvals, which entails significant capital costs and substantial time to develop.

149.    Along with its persistent high market share and the high barriers to entry in each relevant market, Wabtec has a demonstrated ability to control prices and exclude competition in the relevant markets.  Wabtec has the ability to raise its prices to monopoly levels without losing sales to competitors.  Wabtec can, and does, charge supra-competitive prices and wrongly restricts customers' ability to freely choose their suppliers.

150.    Wabtec's monopoly power in the relevant markets is not due to growth or development as a consequence of a superior product, business acumen, historic accident, or other competition on the merits, but rather is due to its wide-ranging anticompetitive conduct.

## VIII.   WABTEC'S ANTICOMPETITIVE CONDUCT

151.    Wabtec's anticompetitive conduct here is not surprising given its history with the antitrust laws.  For example, in 2018, DOJ entered into a settlement agreement with Knorr-Bremse AG and Wabtec because "the companies had for years maintained unlawful agreements not to compete for each other's employees."[22]

152.    Wabtec has also relied on aggressive litigation tactics to delay, discourage, and/or outright stop competitors to protect its market position.  For example, around the time it entered its settlement agreement with DOJ concerning its use of no-poach agreements, Wabtec maintained three separate lawsuits to prevent Siemens Mobility, Inc. from offering a competing PTC system in the United States.  In one lawsuit, Wabtec exposed its anticompetitive motivation for the litigation, claiming that Siemens's alleged patent infringement threatened Wabtec's "pricing discretion for [PTC]" and risked triggering "price erosion whose magnitude and adverse effects cannot be adequately compensated for in money damages."[23]

153.    Throughout its history, Wabtec has further entrenched its monopoly power through strategic acquisitions designed to consolidate its market control by eliminating potential competitors.  For example, in 2016, DOJ investigated Wabtec's acquisition of its competitor—

---

[22]    Press Release, U.S. Department of Justice, Justice Department Requires Knorr and Wabtec to Terminate Unlawful Agreement Not to Compete for Employees (Apr. 3, 2018), https://www.justice.gov/opa/pr/justice-department-requires-knorr-and-wabtec-terminate-unlawful-agreements-not-compete.
[23]    First Am. Compl. ¶ 97, *Westinghouse Air Brake Tech. Corp. v. Siemens Indus., Inc.*, No. 17-1687 (D. Del. Sept. 19, 2017), ECF No. 14.

Faively Transport S.A.—and required Wabtec to divest all of Faively's U.S. freight car brakes business to consummate the transaction.

154.    In the years following Wabtec's acquisition of GE Transportation, the concerns about anticompetitive exclusionary conduct have been proven to be prescient.  At the time of the transaction, Wabtec professed its commitment to "open competition" and its intention to ensure that Progress Rail and others would have access to the inputs necessary for continued competition.

155.    Since its acquisition of GE Transportation, however, Wabtec has taken increasingly aggressive actions to build upon and cement its monopoly power by using its "extensive product portfolio" to grow its "strong North American market share."[24]  Wabtec is now foreclosing competitors like Progress Rail from inputs and information that are necessary to enter and/or continue competing in the relevant markets, and, in the process, breaching the agreements upon which it proclaimed its commitment to "open competition" and "integration."

156.    The exclusionary tactics Wabtec uses both individually and in combination to harm the competitive process and consumers include, but are not limited to:

- Using its dominant position to reduce rail industry required cross-product compatibility with complimentary products through, among other things, restricting the flow of critical data and information.

- Using its dominant position to impose unnecessary costs and delays on competitors with the goal of impairing and forcing competitors out of business and obtaining even greater power to control prices.

- Using its dominant position to make knowingly false statements to consumers about the viability of its competitor.

157.    Wabtec's exclusionary conduct has been shown, in part, by its continued breaches of the 2019 Interchangeability Agreement and the 2020 I-ETMS License Agreement.

---

[24]     Investor Day, Westinghouse Air Brake Technologies Corp. (March 9, 2022), at 22, https://ir.wabteccorp.com/static-files/159306ca-4e93-4de8-a1f3-10a33f8cbd53.

## A. Wabtec Uses Its PTC System To Frustrate Compatibility With Complimentary Products.

158.   Wabtec is the dominant supplier of PTC systems to Class I railroads in North America.  Due to the federal mandate and the lack of alternative suppliers, virtually every locomotive operating in North America today carries a Wabtec PTC system.  For example, during its 2020 Investor Meeting, Wabtec's Global Technology Officer proudly proclaimed that Wabtec's PTC system became "the standard and the backbone of the North American Freight operation" and that "[m]ore than 90% of the North American locomotive and cab car are equipped with Wabtec PTC."[25]

159.   Because virtually every locomotive operating in North America carries a Wabtec PTC system, Wabtec's onboard computer called TMC has become the critical communications hub through which many other locomotive electronic systems must interoperate.

160.   As a result, a successful interface with TMC is an essential component of many product development efforts and a determinative factor in the success or failure of locomotives and several locomotive hardware and software systems.

161.   Wabtec's dominant position over PTC systems provides it several avenues through which it engages in anticompetitive conduct designed to frustrate competition and protect its monopoly power in the relevant markets, as the examples below demonstrate.

---

[25]   Dominque Malenfant, Wabtec Global Technology Officer, Westinghouse Air Brake Technologies Corp. Investor Meeting (Mar. 10, 2020), https://ir.wabteccorp.com/static-files/4d318e0d-6824-425c-a63d-9f3f59eb7e82.

### a. Wabtec Uses Its Control Over PTC Systems To Protect Its Monopoly Over Long-Haul Freight Locomotives, Including Tier IV Locomotives.

162.    As the dominant supplier of federally mandated PTC systems, Wabtec is also the dominant supplier of the inputs that are required to commission the PTC system and ensure its interoperability with other systems in the rail industry.

163.    Wabtec updates its PTC system software multiple times per year, which requires corresponding updates and adjustments for existing electronic systems connected to Wabtec's PTC system.   Contrary to its professed commitment to "open competition," "integration," and compatibility under the 2019 Interchangeability Agreement and 2020 I-ETMS License Agreement, Wabtec uses these frequent updates and adjustments to interfere with seamless operation of electronics and other complimentary equipment on non-Wabtec locomotives.

164.    For example, Wabtec has refused to provide or delayed the required notification of PTC system updates and the information necessary for Progress Rail to ensure the PTC systems on its locomotives and its complimentary cab products effectively communicate with each other.

165.    By refusing to provide or otherwise obstructing and/or limiting access to communication protocols and software updates other locomotive systems need to interface with Wabtec's TMC as contemplated by AAR standards, Wabtec causes unnecessary operational issues on Progress Rail's locomotives that frustrate customers, lead to customer dissatisfaction, and cause customers not to buy Progress Rail locomotives.

166.    Such frustration and dissatisfaction also has caused customers to store Progress Rail's locomotives first, which ultimately limits revenue from maintenance, service parts, and other aftermarket support in the rail industry.

167.    On information and belief, Wabtec's goal is to sour Progress Rail's customer relationships so that those customers look elsewhere for locomotives.

### b. Wabtec Uses Its Control Over PTC Systems To Protect Its Monopoly Over EMS Systems.

168.    Before its acquisition of GE Transportation, Wabtec did not sell an EMS system. As a result, it had no incentive to impede the successful integration of any EMS system with its PTC system.  Instead, it had the incentive to ensure integration with any and all EMS systems to generate more sales of its PTC system.  Those incentives changed after the acquisition.

169.    Wabtec now uses its market dominance over PTC systems to frustrate the ability of competing EMS systems to properly interface with its long-haul freight locomotives by withholding and delaying the disclosure of data and information required in the rail industry.

170.    Wabtec's conduct unnecessarily delayed the release of Progress Rail's EMS system, called Talos.

171.    Under the 2020 I-ETMS License Agreement, Wabtec Railway Electronics, Inc. granted a perpetual, non-exclusive license to Progress Rail Service Corporation's permitted use for any future upgrades or changes to the on-board PTC system impacting the EMS system to allow Talos to remain compatible and integrated.

172.    Under the 2020 I-ETMS License Agreement, Wabtec Railway Electronics, Inc. must timely deliver to Progress Rail Service Corporation changes, updates, and modifications to the on-board PTC system.

173.    Wabtec Railway Electronics, Inc., however, does not timely deliver any changes, updates, and modifications to the on-board PTC system.  These delays create unnecessary operational issues for customers considering Talos and lead them to Wabtec's older Trip Optimizer product.

174.     These and other delay tactics have caused discussions with customers interested in Talos to drag on for months.

175.     In other instances, Wabtec has used its Ancillary Card Cage chassis called GoLINC to cast doubt on the functionality of Talos.  For example, Wabtec's chassis must be compliant with AAR specification S9101 to provide the necessary power for software like Talos to function. During testing, Wabtec's chassis have not been compliant with the AAR specification and, as a result, have caused Talos (which is in compliance with those specifications) to shut down.  The mere appearance that Progress Rail's Talos cannot seamlessly interface with Wabtec's chassis calls into question the reliability of Talos and places Progress Rail at a competitive disadvantage.

176.     These delays have entrenched Wabtec's monopoly in the EMS systems market.  By interfering with customers' ability to freely choose between EMS systems, Wabtec has forced Class I railroads to disproportionately install Trip Optimizer at the expense of purchasing Talos.

177.     This conduct is not only just one example of Wabtec's anticompetitive tactics, but it is also a breach of the 2019 Interchangeability Agreement and the 2020 I-ETMS License Agreement.

### B. Wabtec Uses Its Dominant Position In The EMS Market To Foreclose Competition For Long-Haul Freight Locomotives

178.     Wabtec's EMS product, Trip Optimizer, is the dominant system used by freight locomotives in the United States and North America holding about 79 percent of the market.

179.     Wabtec uses its dominant position in EMS systems to engage in anticompetitive exclusionary conduct to maintain its monopoly over long-haul freight locomotives.

180.     The ability to install an EMS system is important to customers of long-haul freight locomotives.  The use of EMS system on freight locomotives is important to customers because it allows a locomotive to achieve on-time arrival with optimal fuel usage and provides an effective

method to reduce emissions.  It also provides an opportunity for a locomotive manufacturer to obtain valuable EPA emissions credits from which the customer may benefit.

181.    In general, locomotive manufacturers must certify that their locomotives comply with emissions standards.  Progress Rail certifies the emissions standards on Progress Rail locomotives, and Wabtec certifies the emissions standards on Wabtec locomotives.  If the emissions are below the applicable emissions standard, emissions credits may be generated.  *See*, *e.g.*, 40 C.F.R. § 1033.705.

182.    The Tier IV emissions standards published in 2015 (40 C.F.R. Part 1033) allow for the generation of emissions credits for every Tier IV locomotive produced with emissions below required standards.  This emissions delta results in credits that may be "bank[ed]" by locomotive manufacturers, 40 C.F.R. § 1033.715, and then used to offset higher emissions by other locomotives, 40 C.F.R. § 1033.701(a).  One Tier IV credit-consuming locomotive (*i.e.*, Tier III locomotive) may be sold for every newly manufactured Tier IV locomotive.

183.    Possession of emissions credits is critical to ongoing competition because the credits allow locomotive manufacturers to sell locomotives (and it allows customers to buy locomotives) that are manufactured in compliance with Tier III standards (which are about $400,000 cheaper to manufacture than Tier IV locomotives and are cheaper to maintain).

184.    When bidding for new sales, Class I freight locomotive customers expect manufacturers to include pricing for a credit consuming Tier IV locomotive (*i.e.*, Tier III) with every bid for a newly manufactured Tier IV locomotive.  If the manufacturer does not have a credit unit to offer, then it is unlikely to win the bid.

185.    After its acquisition of GE Transportation, Wabtec agreed to work with Progress Rail to allow Trip Optimizer to run on Progress Rail locomotives under the 2019 Interchangeability Agreement.

186.    Wabtec, however, has used rail industry emissions credits to engage in anticompetitive exclusionary conduct to maintain its monopoly over long-haul freight locomotives.

187.    In particular, Wabtec has told customers who own Progress Rail diesel long-haul locomotives that it will only support their decision to install Trip Optimizer on Progress Rail locomotives if Wabtec can control the valuable emissions credits generated by the EMS system rather than the credits staying with Progress Rail, the locomotive manufacturer described in 40 C.F.R. Part 1033, to use for the benefit of its customers.

188.    Wabtec knows that taking the emission credits generated from Progress Rail locomotives would insulate Wabtec's market share in both diesel long-haul freight locomotives and Tier IV long-haul freight locomotives because Progress Rail would lose the ability to use the credits to sell more Tier IV credit-consuming (*i.e.*, Tier III) locomotives.

189.    Wabtec's retention of emissions credits generated on Progress Rail's locomotives would result in Progress Rail subsidizing Wabtec's future Tier IV compliant locomotives and would further entrench Wabtec's monopoly position in that market.

190.    The mere demand for such credits owned by Progress Rail is alone enough to frustrate the competitive process even if Trip Optimizer is ultimately installed on a Progress Rail locomotive.  Each time Wabtec makes a credit demand, it forces Progress Rail to engage in an unnecessary and time-consuming dialogue with Wabtec.  This dialogue sometimes even requires Progress Rail to ask the customer who wants to install Trip Optimizer on a Progress Rail

locomotive to intervene in the dispute.  The resulting delay leads to customer dissatisfaction with Progress Rail and discourages customers from buying Progress Rail locomotives, and instead funnels them into Wabtec's monopoly.

191.    Wabtec possesses the ability to foreclose customers from independently installing Trip Optimizer on Progress Rail locomotives.  An EMS system, like Trip Optimizer, must have the ability to communicate with the host locomotive.  That communication requires a degree of cooperation between the locomotive manufacturer and the EMS system manufacturer.

192.    Wabtec can prevent Trip Optimizer from properly functioning on Progress Rail's locomotives by withholding Trip Optimizer's ability to exchange and make use of information from Progress Rail's locomotives (in other words, preventing the EMS system from being interoperable with the host locomotive).

193.    For example, AAR has a mandated specification for the locomotive command and control module ("LCCM"), which requires locomotive manufacturers to allow and support other companies' EMS systems on their locomotives.  LCCM is a common interface ensuring interoperability between the locomotive and its software.  Wabtec intentionally stalled developing an LCCM module that complied with AAR specifications.  Progress Rail, however, developed a LCCM module that was compliant with AAR's specifications so that it could install EMS systems on its locomotives.

194.    In 2020, when one Class I railroad was considering whether to deploy an EMS system on its fleet that included both Progress Rail and Wabtec locomotives, Wabtec intentionally delayed providing answers to why its Trip Optimizer was not compatible and interoperable with Progress Rail's LCCM module.

195.    Wabtec used this delay to cast doubt on the ability of Progress Rail's LCCM module to provide an authenticated electronic "handshake" to Trip Optimizer.  These and other delay tactics caused discussions with the customer interested in adding an EMS system to Progress Rail locomotives to drag on for more than a year.

196.    These delays have entrenched Wabtec's monopoly in the EMS market.  By interfering with customers' ability to freely choose between EMS systems, Wabtec has forced Class I railroads to disproportionately install EMS systems on Wabtec locomotives and disproportionately store Progress Rail Locomotives.

197.    If a customer cannot install Trip Optimizer on a Progress Rail locomotive, Progress Rail locomotives are placed at a disadvantage in the eyes of railroads, which also results in a disproportionate number of Progress Rail locomotives being stored.  This disadvantage has competitive consequences, including, but not limited to, railroads more likely developing a false impression that Wabtec locomotives are superior or easier to utilize – leading to more Wabtec locomotive sales.

198.    As just another example, in 2021, Wabtec made similar unwarranted demands for emissions credits when a customer sought to install Trip Optimizer on Progress Rail locomotives.

199.    Wabtec's demands for emissions credits before installing Trip Optimizer on Progress Rail's locomotives is also a breach of the 2019 Interchangeability Agreement, which expressly anticipated open competition.  The 2019 Interchangeability Agreement provides that the Parties would "use commercially reasonable efforts to collaborate in the creation and maintenance of . . . Joint Standards and Specifications in order to continue open competition in the locomotive cab electronics industry."  However, Wabtec has refused to provide without unnecessary delay the "information required to maintain interchangeability, compatibility or interface with" Trip

Optimizer, even though the parties expressly anticipated that their agreement would require them "to work together . . . to allow Trip Optimizer to run on a [Progress Rail] platform."

### C. Wabtec Uses Its LOCOTROL System To Increase Competitors' Costs And Lead Times.

200.    Wabtec has disregarded additional contractual commitments under the 2019 Interchangeability Agreement further injuring competition in the market for locomotives.

201.    Wabtec is currently the only known supplier of distributed power systems, which Wabtec calls LOCOTROL.  LOCOTROL is a control and communication system that enables coordinated braking and power distribution between lead and trailing locomotives.

202.    LOCOTROL has become industry standard for most locomotives, and the addition of LOCOTROL drives a higher price for locomotives than they would otherwise cost. LOCOTROL is essential to a locomotive functioning as a "lead" or "head" locomotive.  Given its necessary integration with braking systems, LOCOTROL is necessarily integrated with the PTC system, EMS, and other essential cab electronics, the vast majority of which will be supplied under Wabtec's highly dominant position.

203.    On information and belief, Wabtec intentionally increases the lead time required to purchase LOCOTROL when it knows that Progress Rail intends to combine LOCOTROL with a braking system from another manufacturer, like NYAB.

204.    On information and belief, Wabtec intentionally increases the cost of purchasing LOCOTROL when it knows that Progress Rail intends to install it on a non-Wabtec locomotive. As an example, Wabtec continues to include additional "non-recurring engineering" expenses for LOCOTROL use on Progress Rail locomotives, even though LOCOTROL has been used and integrated on Progress Rail locomotives for many years.

205.    Wabtec engages in this conduct to disadvantage Progress Rail with increased costs and unnecessary delays.  These increased costs and delays lead to customer dissatisfaction and incentivize customers to purchase Wabtec locomotives already installed with LOCOTROL.

206.    This conduct is not only another example of Wabtec leveraging its dominant position over one product to protect its locomotives from competition, but it is also a breach of the 2019 Interchangeability Agreement.

207.    The 2019 Interchangeability Agreement requires Wabtec to offer LOCOTROL to Progress Rail on a stand-alone basis without requiring that it be bundled with any other products or components.

208.    On information and belief, the lead time and cost to purchase LOCOTROL is reduced when Progress Rail intends to combine LOCOTROL with Wabtec's braking system.  Put another way, Wabtec offers LOCOTROL on better terms if it is being bundled with another product, which is a clear violation of the 2019 Interchangeability Agreement.

### D. Wabtec's Knowingly False Statements At The May 9, 2023 Goldman Sachs' Industrials and Materials Conference

209.    Wabtec's anticompetitive conduct continued recently, when, on May 9, 2023, at Goldman Sachs' Industrials and Materials Conference held in New York, New York, Wabtec CFO John Olin made various false statements about Progress Rail's ongoing viability and competition in the Tier IV long-haul locomotive market.[26]

---

[26]    John Olin, Wabtec Executive Vice President and Chief Financial Officer, Goldman Sachs Industrials Conference (May 9, 2023), https://ir.wabteccorp.com/events/event-details/goldman-sachs-industrials-conference.

210.    Mr. Olin first admitted that Wabtec possesses monopoly power in the market for Tier IV locomotives by stating that "about 90% of the assets running in North America were our [*i.e.*, Wabtec's] Tier IV's."

211.    Mr. Olin then falsely stated that: "[Progress Rail] chose to exit that business," *i.e.*, the Tier IV locomotive business.  Similarly, Mr. Olin falsely claimed: "[Progress Rail] talked about exiting their investment in Tier IV locomotives."

212.    Mr. Olin also falsely stated that Wabtec would be a customer's only option going forward: "In Tier IV, it appears [Progress Rail] won't be competing going forward, so anything that's new in the United States from here on out, they would not be an option for a customer." And he continued: "Given the competitive dynamics, it would be that we're the only other competitor that supplies Tier IV."

213.    Wabtec's statements were each clearly false.  Progress Rail continues to offer and market Tier IV long-haul locomotives, including on its website.

214.    Wabtec made these statements with knowledge of their falsity and with the intent to convince customers that Wabtec is the only option for Tier IV long-haul locomotives in the United States.

215.    Wabtec's statements were not impromptu mistakes.  The statements were published to an international audience, including Progress Rail's primary domestic customers.

216.    Wabtec made these false statements because it knew such information would be material to Tier IV long-haul locomotive purchasing decisions.  Indeed, statements from the CFO of a large, publicly traded company—would be reasonably relied upon by customers and potential customers in the market, as well as analysts covering the market.

217.    As a result, Wabtec's statements falsely led customers and potential customers to believe that Progress Rail has left the market, Wabtec is their only choice, and there is no alternative but to accept Wabtec's supra-competitive prices and products.

218.    Wabtec made these statements to customers and potential customers who lacked sufficient knowledge to know whether they were false.

219.    These statements were not readily susceptible to neutralization or other form of offset.  While Progress Rail has continued to market Tier IV long-haul locomotives to the market at large, Progress Rail does not know which specific customers attended Goldman Sachs' Industrials and Materials Conference or which specific customers have listened to the recording posted on Wabtec's website, and so does not have the ability to communicate with them to neutralize or offset Wabtec's misrepresentations.

220.    Wabtec continues to republish these false statements by maintaining a recording of the false statements on its website.

### E.  Wabtec's 2019 Acquisition Of GE Transportation Has Foreclosed Progress Rail And Other Potential Rivals From Competing Effectively.

221.    Wabtec's acquisition of GE Transportation substantially lessened competition and cemented Wabtec's monopoly power in the markets for long-haul freight locomotives, Tier IV long-haul freight locomotives, and EMS systems.

222.    At the time Wabtec announced its intention to acquire GE Transportation, Progress Rail identified that the acquisition could lead to anticompetitive exclusionary conduct.

223.    In an attempt to address the competition issues raised by Progress Rail, Wabtec entered into the 2019 Interchangeability Agreement and the 2020 I-ETMS License Agreement with Progress Rail.

48

224.     In the 2019 Interchangeability Agreement, Wabtec professed its "desire to continue the current open marketplace for locomotive cab electronics and other products in furtherance of open competition, compatibility and interchangeability of locomotives and locomotive components."

225.     In the 2020 I-ETMS License Agreement, Wabtec professed its desire to "facilitate the integration" of its PTC system to allow Progress Rail's EMS system to remain compatible and integrated with the PTC system.

226.     Based on Wabtec's professed commitment to "open competition," "integration," and compatibility, Progress Rail believed it would have the opportunity to compete fairly on merits and that customers would be able to freely choose products.

227.     It has become clear as Progress Rail has tried to work with Wabtec under these agreements that Wabtec has no intention of complying with its contractual commitments of "open competition," "integration," and compatibility, ultimately culminating in the May 2023 misrepresentations about Progress Rail's position in the marketplace.

228.     Based on these events, it is clear that the acquisition has caused and will continue to cause significant vertical foreclosure issues as shown by Wabtec's anticompetitive conduct described herein.

229.     Wabtec's conduct has caused and will continue to injure Progress Rail and consumers by foreclosing competition in each of the three relevant markets.

230.     Divestiture of the 2019 acquisition is necessary to allow additional competitors into the market and combat the vertical integration that has allowed Wabtec to engage in its anticompetitive conduct.

## IX.    ANTICOMPETITIVE EFFECTS

### A.  Wabtec's Conduct Has Injured Consumers And Competitors

231.    The exclusionary acts and practices of Wabtec as alleged herein have foreclosed Progress Rail and other competitors from the relevant markets, have restrained trade, and have preserved and entrenched Wabtec's monopoly power.

232.    By restricting the entry of competitors, Wabtec's exclusionary conduct deprives U.S. businesses, consumers, and the broader economy the benefits of competition, such as increased choice, competitive pricing, and enhanced safety, efficiency, and productivity in the U.S. freight rail network.

233.    Wabtec has profited, and continues to profit, from its unlawful conduct to the detriment of consumers.

234.    Railroads have been harmed as a direct result of Wabtec's anticompetitive conduct because they are: (a) deprived of the freedom to make competitive choices about which products should be used on their equipment; (b) deprived of continuous innovation; and (c) deprived of competitive pricing for locomotives and EMS systems.  Railroad users are similarly injured because they are denied the most innovative products and pay higher prices.

235.    Due to its monopoly position in the long-haul freight locomotive market, the Tier IV long-haul freight locomotive market, and the EMS systems market along with its status as the dominant provider of PTC systems and other complimentary cab hardware, Wabtec can, and does, control pricing and wrongly restricts customers' ability to freely choose their suppliers.

236.    Indeed, Wabtec has profited, and continues to profit, from its unlawful, exclusionary conduct, to the detriment of consumers.  As Wabtec's CFO said to analysts during a

July 27, 2023 earnings call: "We've watched our margins come up over the last couple of years, and that is a function of bringing in better orders at higher profit."

### B.  Wabtec's Anticompetitive Conduct Has Injured Progress Rail Specifically

237.    Wabtec's anticompetitive conduct directly targets Progress Rail.  It has deprived Progress Rail of existing and potential customers in the relevant markets.  As a result, Progress Rail has suffered and will continue to suffer injury from Wabtec's preservation of its monopolies in the relevant markets.

238.    Absent Wabtec's anticompetitive conduct, Progress Rail's revenues and profits would be substantially greater, and its competitive influence would have a downward effect on pricing in the relevant markets.

239.    There are no aspects of Wabtec's conduct that are beneficial to competition. Progress Rail's injury is an integral aspect of Wabtec's unlawful conduct; flows from that which renders Wabtec's conduct unlawful; and it is the type of injury the antitrust laws were intended to prevent.

240.    Progress Rail's injury is inseparable from the alleged harm to competition.

241.    Wabtec's unlawful conduct will continue unless injunctive and equitable relief is granted.

### C.  Wabtec's Anticompetitive Conduct Lacks A Pro-Competitive Business Justification

242.    There are no legitimate business or pro-competitive justifications for Wabtec's exclusionary and anticompetitive conduct, and any purported business justifications are pretexts. Even if such justifications existed, any purported pro-competitive benefits can be achieved through alternative means less restrictive of competition.

## X.     BREACH OF THE 2019 INTERCHANGEABILITY AGREEMENT

243.     Wabtec and Progress Rail entered into a valid and binding 2019 Interchangeability and License Agreement.

244.     Under the 2019 Interchangeability Agreement, Wabtec agreed, among other things, to (a) allow Trip Optimizer to run on a Progress Rail's locomotives and (b) continue open competition in the locomotive cab electronics industry. Wabtec further agreed not to implement or modify standards and specifications in a manner that would "adversely impact the ability of any locomotive component or system" to interoperate with Wabtec's systems and components.

245.     Wabtec has breached the 2019 Interchangeability Agreement by, among other things, (1) refusing to collaborate or otherwise work together to allow Trip Optimizer to run on Progress Rail locomotives and (2) frustrating the integration of its on-board PTC system.

246.     Progress Rail has repeatedly tried to work with Wabtec to resolve these issues under the 2019 Interchangeability Agreement through communications, meetings, and visits, but Wabtec's conduct has continued.  Wabtec's continued course of conduct has shown such efforts by Progress Rail would be futile.

## XI.     BREACH OF THE 2020 I-ETMS LICENSE AGREEMENT

247.     Wabtec Railway Electronics, Inc. has breached its contractual commitments under the 2020 I-ETMS License Agreement.

248.     On June 5, 2020, Wabtec Railway Electronics, Inc. and Progress Rail Services Corporation agreed to the 2020 I-ETMS License Agreement under which Wabtec Railway Electronics Inc. would facilitate the integration of its on-board PTC system with Progress Rail Service Corporation's EMS system.

249.     Under the 2020 I-ETMS License Agreement, which expires in 2034, Wabtec Railway Electronics, Inc. granted a perpetual, non-exclusive license to Progress Rail Service Corporation's permitted use for any future upgrades or changes to the on-board PTC system impacting the EMS system to allow Progress Rail Service Corporation's product to remain compatible and integrated.

250.     Under the 2020 I-ETMS License Agreement, Wabtec Railway Electronics, Inc. must timely deliver to Progress Rail Service Corporation changes, updates and modifications to the on-board PTC system.

251.     Wabtec Railway Electronics, Inc. is breaching the 2020 I-ETMS License Agreement by failing to timely deliver any changes, updates and modifications to the on-board PTC system.

## XII.   CAUSES OF ACTION

### COUNT I
### (Violation of Section 7 of the Clayton Act (15 U.S.C. §§ 18, 26) (Acquisition Lessening Competition and/or Tending to Create Monopoly))

252.     Progress Rail expressly incorporates its allegations in Paragraphs 1 – 251 as if fully stated herein.

253.     Wabtec's acquisition of GE Transportation substantially lessened competition in the market for long-haul freight locomotives, Tier IV long-haul freight locomotives, and EMS systems in violation of Section 7 of the Clayton Act.

254.     Section 7 of the Clayton Act provides that "no corporation engaged in commerce shall acquire . . . the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

255.     The effect of the 2019 acquisition has been, and will continue to be, substantially to lessen competition or to tend to create a monopoly in the relevant markets in violation of Section 7 of the Clayton Act.

256.     Wabtec's conduct described above has caused and will continue to cause Progress Rail injury by foreclosing it from competing in each of the three relevant markets.

257.     Wabtec's conduct has caused Progress Rail antitrust injury, including, but not limited to, reduced sales, reduced revenues and profits, increased costs, loss of access to markets, loss of market position, lost goodwill, and other injuries that the antitrust laws are meant to prevent.

258.     If not enjoined, Wabtec will continue to engage in anticompetitive conduct that will further injure Progress Rail, other competitors, and competition.

259.     Progress Rail is threatened with further loss or damage by reason of the actual or likely lessening of competition described above and is entitled to injunctive relief under Section 16 of the Clayton Act sufficient to restore competition in the relevant markets comparable to that which existed before the illegal 2019 acquisition.

260.     As a result of Wabtec's actions in violation of 15 U.S.C. § 18, Wabtec is required to divest its equity, ownership stake, and all other tangible and intangible assets it acquired in the unlawful transactions.  *See, e.g.*, *Steves & Sons, Inc. v. Jeld-Wen, Inc.*, 988 F.3d 690, 698–99 (4th Cir. 2021) (affirming district court order granting plaintiff's "request to unwind . . . merger" that violated Clayton Act).

## COUNT II
### (Violation of Section 2 of the Sherman Act (15 U.S.C. § 2) (Monopolization)

261.     Progress Rail expressly incorporates its allegations in Paragraphs 1 – 260 as if fully stated herein.

262.   Wabtec possesses monopoly power in relevant antitrust markets, namely the markets for long-haul freight locomotives, Tier IV long-haul freight locomotives, and EMS systems.

263.   Wabtec's monopoly power in the market for long-haul freight locomotives can be fairly inferred from the high barriers to entry and Wabtec's high market share, which has been publicly reported as approximately 75 percent and which Progress Rail has internally estimated at 71 percent.  Wabtec itself has publicly suggested that its market share is even higher.  Wabtec's CFO has stated that Wabtec has "about an 80% share of what is running on the rails of heavy haul locomotives in North America. . . ."[27]

264.   Wabtec's monopoly power in the market for Tier IV long-haul freight locomotives can be fairly inferred from its high market share, which it publicly admits is about 90 percent.

265.   Wabtec's monopoly power in the market for EMS systems can be fairly inferred from its high market share, which is approximately 79 percent.

266.   Wabtec also has a demonstrated ability to control prices and wrongly restricting customers' ability to freely choose their suppliers.

267.   Along with its acquisition of GE Transportation, Wabtec has willfully acquired and maintained that monopoly power, through anticompetitive conduct discussed above, including, but not limited to: (1) foreclosing Progress Rail from necessary inputs and information for its products; (2) breaching its preexisting contractual commitments, including the 2019 Interoperability Agreement and 2020 I-ETMS License Agreement; and (3) knowingly and falsely telling the

---

[27]   John Olin, Wabtec Executive Vice President and Chief Financial Officer, Goldman Sachs Industrials Conference (May 9, 2023), https://ir.wabteccorp.com/events/event-details/goldman-sachs-industrials-conference (emphasis added).

market that Progress Rail would not be a competitor in the market for long-haul freight locomotives going forward.

268.    Wabtec's unlawful acquisition and maintenance of monopoly power has caused and will continue to cause Progress Rail injury by foreclosing it from competing in each of the three relevant markets.

269.    Wabtec's willful conduct as described has given Wabtec the ability to control and exclude competition.

270.    Wabtec's conduct has caused Progress Rail antitrust injury, including, but not limited to, reduced sales, reduced revenues and profits, increased costs, loss of access to markets, loss of market position, lost goodwill, and other injuries that the antitrust laws are meant to prevent.

271.    There are effective and significant barriers to entry into the market.

272.    As a direct, substantial, proximate and immediate result of Wabtec's anticompetitive and unlawful actions, Progress Rail has been injured in its business, property, trade, reputation and competitive position in an amount to be established at trial.

## COUNT III
**(Violation of Section 2 of the Sherman Act (15 U.S.C. § 2) (Attempted Monopolization)**

273.    Progress Rail expressly incorporates its allegations in Paragraphs 1 – 272 as if fully stated herein.

274.    Along with its acquisition of GE Transportation, Wabtec has engaged in predatory and anticompetitive conduct discussed above, including, but not limited to, (1) foreclosing Progress Rail from necessary inputs and information for its products; (2) breaching its preexisting contractual commitments, including the 2019 Interoperability Agreement and the 2020 I-ETMS License Agreement; and (3) knowingly and falsely telling the market that Progress Rail would not be a competitor in the market for long-haul freight locomotives going forward.

275.     Wabtec performed these actions with the specific intent to monopolize the markets for long-haul freight locomotives, Tier IV long-haul freight locomotives, and EMS systems.

276.     Wabtec has a dangerous probability of achieving monopoly power.

277.     Wabtec's monopoly power in the market for long-haul freight locomotives can be fairly inferred from the high barriers to entry and Wabtec's high market share, which has been publicly reported as approximately 75 percent and which Progress Rail has internally estimated around 71 percent.  Wabtec itself has publicly suggested that its market share is even higher. Wabtec's CFO has stated that Wabtec has "about an 80% share of what is running on the rails of heavy haul locomotives in North America. . . ."[28]

278.     Wabtec's monopoly power in the market for Tier IV long-haul freight locomotives can be fairly inferred from its high market share, which it concedes is approximately 90 percent.

279.     Wabtec's monopoly power in the EMS systems market can be fairly inferred from its high market share, which is approximately 79 percent.

280.     Wabtec also has a demonstrated ability to control prices and wrongly restricting customers' ability to freely choose their suppliers.

281.     To the extent that Wabtec has not already monopolized any of these markets, it has a dangerous probability of doing so, which threatens direct injury to Progress Rail.

282.     Wabtec's ongoing anticompetitive conduct presents a dangerous probability that Wabtec will succeed, to the extent it has not already, in its attempt to monopolize the relevant market, and will succeed in accomplishing its unlawful purpose of obtaining monopoly power.

---

[28]     John Olin, Wabtec Executive Vice President and Chief Financial Officer, Goldman Sachs Industrials Conference (May 9, 2023), https://ir.wabteccorp.com/events/event-details/goldman-sachs-industrials-conference (emphasis added).

283.     As a direct, substantial, proximate and immediate result of Wabtec's anticompetitive and unlawful actions, Progress Rail has been injured in its business, property, trade, reputation and competitive position in an amount to be established at trial.

## COUNT IV
## (Breach of Contract (2019 Interchangeability Agreement))

284.     Progress Rail expressly incorporates its allegations in Paragraphs 1 – 283 as if fully stated herein.

285.     Wabtec and Progress Rail entered into a valid and binding agreement in the February 7, 2019 Joint Development, Compatibility, Interchangeability and License Agreement.

286.     That Agreement was formed when both parties signed the 2019 Interchangeability Agreement "in consideration of [the Agreement's] recitals, the mutual promises contained [in the Agreement], and for other good and valuable consideration, the receipt and adequacy of which [were] acknowledged by the Parties."

287.     In doing so, each Party thereby accepted the other Party's offer to collaborate in the development and maintenance of certain standards.  The parties mutually assented to and intended to be bound by the terms of the 2019 Interchangeability Agreement.

288.     Under the 2019 Interchangeability Agreement, Wabtec agreed, among other things, "to work together . . . to allow Trip Optimizer to run on a [Progress Rail] platform."  Wabtec also agreed to "use commercially reasonable efforts to collaborate in the creation and maintenance of . . . Joint Standards and Specifications in order to continue open competition in the locomotive cab electronics industry."

289.     Wabtec further agreed not to implement or modify Joint Standards and Specifications in a manner that would "adversely impact the ability of any locomotive component

or system" to interoperate with Wabtec's systems and components, unless Progress Rail was given adequate time to test and approve the change.

290.     Wabtec has breached the 2019 Interchangeability Agreement by, among other things, (1) refusing to collaborate or otherwise work together to allow Trip Optimizer to run on Progress Rail locomotives and (2) frustrating the integration of its on-board PTC system.

291.     These breaches have injured Progress Rail by harming its ability to compete in the markets for long-haul freight locomotives and Tier IV freight locomotives.

292.     The 2019 Interchangeability Agreement contains an alternate dispute resolution provision for damages claims, but the Agreement expressly provides that "either party may at any time seek injunctive or equitable relief from a court of competent jurisdiction."

293.     Accordingly, Progress Rail seeks only injunctive relief requiring Wabtec to comply with its obligations with respect to its breach of contract claim concerning the 2019 Interchangeability Agreement.

## COUNT V
## (Breach of Contract (2020 I-ETMS License Agreement))

294.     Progress Rail expressly incorporates its allegations in Paragraphs 1 – 293 as if fully stated herein.

295.     Wabtec Railway Electronics, Inc. and Progress Rail Services Corporation entered into a valid and binding agreement in the June 5, 2020 I-ETMS License Agreement.

296.     The parties mutually assented to and intended to be bound by the terms of the 2020 I-ETMS License Agreement.

297.     Under the 2020 I-ETMS License Agreement, Wabtec Railway Electronics, Inc. agreed to facilitate the integration of its on-board PTC system with Progress Rail Service Corporation's EMS system.

298.    Under the 2020 I-ETMS License Agreement, Wabtec Railway Electronics, Inc. granted a perpetual, non-exclusive license to Progress Rail Service Corporation's permitted use for any future upgrades or changes to the on-board PTC system impacting the EMS system to allow Progress Rail Service Corporation's product to remain compatible and integrated.

299.    Under the 2020 I-ETMS License Agreement, Wabtec Railway Electronics, Inc. must timely deliver to Progress Rail Service Corporation changes, updates and modifications to the on-board PTC system.

300.    Wabtec Railway Electronics, Inc. has breached the 2020 I-ETMS License Agreement by, among other things, failing to timely deliver any changes, updates and modifications to the on-board PTC system.

301.    The 2020 I-ETMS License Agreement references and incorporates the dispute resolution provisions of the 2019 Interchangeability Agreement, which expressly provides that "either party may at any time seek injunctive or equitable relief from a court of competent jurisdiction."

302.    Accordingly, Progress Rail Services Corporation seeks only injunctive relief requiring Wabtec Railway Electronics, Inc. to comply with its obligations with respect to its breach of contract claim concerning the 2020 I-ETMS License Agreement.

**COUNT VI**
**(Violation of Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)) (False Commercial Statements and Unfair Competition)**

303.    Progress Rail expressly incorporates its allegations in Paragraphs 1 – 302 as if fully stated herein.

304.    Wabtec has made misrepresentations concerning Progress Rail's business.  More specifically, Wabtec's CFO stated that Progress Rail had left the Tier IV long-haul locomotive market in the United States, even though this is false.

305.    Wabtec caused these false statements to enter interstate commerce by delivering these comments at the Goldman Sachs' Industrials and Materials Conference and continuing to republish a recording of them on its website.

306.    These and similar statements were material to customers' Tier IV long-haul locomotive purchasing decisions.  They falsely led customers and potential customers to believe that Progress Rail has left the market, Wabtec is their only choice, and there is no alternative but to accept Wabtec's supra-competitive prices.

307.    These statements constitute promotion for purposes of the Lanham Act because (1) they concerned the parties' offerings and so were clearly commercial speech; (2) they were made by Mr. Olin in his capacity as CFO of Wabtec, a competitor of Progress Rail; (3) they were made for the purpose of influencing customers to buy Wabtec's goods, as evidenced by Mr. Olin's statements that Wabtec would now be customers' only option for Tier IV long-haul locomotives; and (4) they were disseminated to relevant consumers because they were made at Goldman Sachs' Industrials and Materials Conference.

308.    Wabtec's misrepresentations have actually deceived or had the tendency to deceive a substantial segment of the audience.  In particular, Wabtec's CFO made these comments in a Q&A session with a Goldman Sachs employee, who repeated and asked questions based on the premise that Progress Rail had left the Tier IV long-haul locomotive market in the United States. These statements—from the CFO of a large, publicly traded company and an employee of an

internationally renowned investment banking firm—would be reasonably relied upon by customers or potential customers in the market.

309.    Progress Rail has been injured and will likely continue to be injured by these false statements both by direct losses of sales by Progress Rail to Wabtec and by a lessening of good will associated with Progress Rail's Tier IV long-haul locomotive products.  In particular, these statements are likely to lead consumers and leading industry participants—like Goldman Sachs— to believe that Progress Rail is no longer offering Tier IV long-haul locomotives, that the locomotives that it has offered were not commercially successful, and that Progress Rail will be unable to service Tier IV long-haul locomotives in the future because (Wabtec has falsely stated) that Progress Rail will no longer be investing in these locomotives.

310.    These statements were not readily susceptible to neutralization or other form of offset.  While Progress Rail has continued to market Tier IV long-haul locomotives to the market at large, Progress Rail does not know which specific customers attended Goldman Sachs' Industrials and Materials Conference or which specific customers have listened to the recording posted on Wabtec's website, and so does not have the ability to communicate with them to neutralize or offset Wabtec's misrepresentations.

311.    Wabtec has also continued to republish the false statements it made at the Goldman Sachs' Industrials and Materials Conference by maintaining a recording of these comments on its website.

312.    These and similar statements were each made with knowledge of their falsity and with the intent to convince customers that Wabtec was the only option for Tier IV long-haul locomotives in the United States.

313.   As a direct, substantial, proximate and immediate result of Wabtec's false information, Progress Rail has been injured in its business, property, trade, reputation and competitive position in an amount to be established at trial.  This false information has also harmed Progress Rail's good will and brand.

## COUNT VII
### (Violation of Delaware Deceptive Trade Practices Act (6 Del. C. §§ 2532(a)(8), (12), 2533)

314.   Progress Rail expressly incorporates its allegations in Paragraphs 1 – 313 as if fully stated herein.

315.   Wabtec has disparaged Progress Rail's Tier IV long-haul locomotives by falsely stating that Progress Rail chose to exit the market, was not an option for customers, and would not be competing going forward.

316.   Wabtec made these false and disparaging statements in the course of business by delivering them at the Goldman Sachs' Industrials and Materials Conference.

317.   Wabtec has also continued to republish the false statements it made at the Goldman Sachs' Industrials and Materials Conference by maintaining a recording of these comments on its website.

## COUNT VIII
### (Defamation)

318.   Progress Rail expressly incorporates its allegations in Paragraphs 1 – 317 as if fully stated herein.

319.   Wabtec has made defamatory statements about Progress Rail.  In particular, by stating that Progress Rail "won't be competing going forward," that Progress Rail "would not be an option for a customer," and that Progress Rail "[Progress Rail] chose to exit that business," Wabtec defamed the quality and competitive positioning of Progress Rail's products.

320.     Third parties, like the customers who were the customers in the audience, would reasonably understand these statements to be defamatory.

321.     These statements concerned Progress Rail and its products.

322.     These statements were published to the Goldman Sachs' Industrials and Materials Conference, and Wabtec has also continued to republish these statements by maintaining a recording of the comments on its website.

323.     These statements were clearly false.  Progress Rail has continued to offer and market Tier IV long-haul locomotives, including on its website.

324.     These and similar statements were each made with knowledge of their falsity and with the intent to convince customers that Wabtec was the only option for Tier IV long-haul locomotives in the United States.

## COUNT IX
### (Trade Libel)

325.     Progress Rail expressly incorporates its allegations in Paragraphs 1 – 324 as if fully stated herein.

326.     Wabtec has made misrepresentations concerning Progress Rail's business.  More specifically, Wabtec's CFO stated that Progress Rail had left the Tier IV long-haul locomotive market in the United States, even though this is false.

327.     Wabtec intended to convince customers that Wabtec was the only option for Tier IV long-haul locomotives in the United States.  Wabtec intended that the publication would cause pecuniary loss to Progress Rail, through direct losses of sales to Wabtec and by a lessening of good will associated with its Tier IV long-haul locomotive products.  In particular, Wabtec intended to lead consumers and leading industry participants to believe: (1) that Progress Rail is no longer offering Tier IV long-haul locomotives, (2) that the locomotives that Progress Rail has offered

were not commercially successful, and (3) that Progress Rail will be unable to service Tier IV long-haul locomotives in the future because Progress Rail will no longer be investing in these locomotives.

328.    Wabtec's misrepresentations have led to the direct loss of sales and injured Progress Rail's good will and brand, as Wabtec intended.

329.    These and similar statements were each made with knowledge of their falsity and with the intent to convince customers that Wabtec was the only option for Tier IV long-haul locomotives in the United States.

## XIII.   PRAYER FOR RELIEF

WHEREFORE, Progress Rail respectfully requests that the Court enter judgment in its favor and against Defendant for:

a.    Actual damages in an amount to be determined at trial;

b.    Treble damages;

c.    Reasonable attorneys' fees and costs;

d.    Permanent injunctive relief in the form of an order requiring:
   i.    Wabtec to divest the GE transportation unit that it acquired in 2019 to a suitable buyer;
   ii.   Wabtec to stop foreclosing Progress Rail from access to the inputs and information necessary for Progress Rail to compete with Wabtec;
   iii.  Wabtec to perform its obligations under the 2019 Interchangeability Agreement;
   iv.   Wabtec Railway Electronics, Inc. to perform its obligations under the 2020 I-ETMS License Agreement;
   v.    Wabtec to stop making misrepresentations, including by removing the Goldman Sachs Industrials and Materials Conference Webcast containing the false statements from Wabtec's website;
   vi.   Wabtec to correct its misrepresentations by withdrawing them from the marketplace and affirmatively renouncing them with corrective statements;

e.    Such other relief as the Court deems just and proper.

## XIV.   JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Progress Rail demands a trial by jury

of all issues properly triable to a jury in this case.


OF COUNSEL:

POTTER ANDERSON & CORROON LLP

Amy B. Manning
Angelo M. Russo
MCGUIREWOODS LLP
77 West Wacker Drive
Suite 4100
Chicago, IL 60601
(312) 849-8100

By: */s/ Jonathan A. Choa*
    Myron T. Steele (#0002)
    Matthew F. Davis (#4696)
    Jonathan A. Choa (#5319)
    Hercules Plaza
    P.O. Box 951
    Wilmington, DE 19899
    (302) 984-6000

Wrede H. Smith, III
MCGUIREWOODS LLP
888 16th Street NW
Suite 500
Black Lives Matter Plaza
Washington, DC 20006
(202) 857-1700

    mdavis@potteranderson.com
    msteele@potteranderson.com
    jchoa@potteranderson.com

*Counsel for Progress Rail Services Corp. and
Progress Rail Locomotive Inc.*

Joshua D. Wade
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
(804) 775-1000

Dated:  September 6, 2023